UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEIDRE[1] ALLUMS,               )        CASE NO. 1:14CV2429
                                )
          Plaintiff,            )        JUDGE PATRICIA A. GAUGHAN
                                )        Magistrate Judge George J. Limbert
     v.                         )
                                )
CAROLYN W. COLVIN[2],           )        Report and Recommendation of
ACTING COMMISSIONER OF          )        Magistrate Judge
SOCIAL SECURITY,                )
                                )
          Defendant.            )


Deidre Allums ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND this case to the ALJ for proper evaluation and articulation of the treating physician rule as to the November 13, 2013 opinion of Dr. Gupta-Rakhit and for reevaluation of Plaintiff's credibility and the third-party statements made by her family and friends.

## I.    PROCEDURAL AND FACTUAL HISTORY

Plaintiff filed her application for SSI on August 18, 2008 alleging disability beginning August 31, 2007 due to depression, bipolar disorder, gastroesophageal reflux disease ("GERD"), anemia, high blood pressure and asthma.  ECF Dkt. #10 ("Tr.") at 177, 196.  The SSA denied Plaintiff's applications initially and on reconsideration.  *Id*. at 112-118. Plaintiff requested an

---

[1]  It appears that Plaintiff's first name is incorrectly spelled on the docket and in Defendant's filings. The docket should reflect that Plaintiff's first name is spelled "Deidre" and not "Diedre."  ECF Dkt. #1 at 1; ECF Dkt. #12.

[2]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

administrative hearing, and on November 10, 2010, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel. *Id*. at 37. He also accepted the testimony of two medical experts ("ME") and a vocational expert ("VE"). *Id*. On April 25, 2011, the ALJ issued a decision denying benefits. *Id*. at 12-29. Plaintiff appealed the decision, and on December 13, 2011, the Appeals Council denied review. *Id.* at 1-7.

Plaintiff filed an appeal to this Court and on March 26, 2013, this Court reversed the ALJ's decision and remanded Plaintiff's case for further proceedings. Tr. at 736; Case Number 1:12CV291. Upon remand, the Court ordered the ALJ to reconsider the weight assigned to the opinion of Dr. Ramirez and to fully and adequately articulate good reasons for the weight assigned to his opinion. Tr. at 750. The Appeals Council issued a remand order based upon the Court's Memorandum Opinion and Order. *Id*. at 754.

The ALJ held hearings on November 18, 2013 and February 13, 2014 and Plaintiff testified at both hearings, with counsel, and a psychological expert ("PE") and vocational expert ("VE") testified at the hearings as well. Tr. at 616-694. On August 7, 2014, the ALJ issued his decision denying Plaintiff SSI. *Id*. at 594-607.

On November 3, 2014, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On April 7, 2015, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #12. On June 8, 2015, Defendant filed a brief on the merits. ECF Dkt. #14. On June 22, 2015, Plaintiff filed a reply brief. ECF Dkt. #15.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

On August 7, 2014, the ALJ acknowledged the Court's remand order and issued another decision. Tr. at 594. The ALJ determined that Plaintiff suffered from asthma, osteoarthritis of the left shoulder, personality disorder, bipolar disorder without psychotic features, borderline intellectual functioning, and mixed polysubstance dependence with periods of remission, which qualified as severe impairments under 20 C.F.R. §416.920(c). *Id*. at 597. The ALJ further determined that Plaintiff's impairments, individually and in combination, did not meet or equal any of the Listings. *Id*. at 597-599.

The ALJ proceeded to find that Plaintiff had the RFC to perform light work as she could lift and carry 10 pounds frequently and 20 pounds occasionally, but she had the following limitations: she could stand or walk up to 6 hours of an eight-hour workday, but only one hour at a time; she could sit for up to 6 hours of a workday, but for only one hour at a time; she could occasionally push, pull or use foot pedals; she could occasionally use ramps or stairs, but never use ladders, ropes and scaffolds; she could constantly balance; she could frequently stoop, kneel, and crouch, but could never crawl; she could reach overhead occasionally with her left arm and frequently with her right; she had to avoid high concentrations of cold, wetness, humidity, smoke, dust, or fumes; she must avoid dangerous machinery and unprotected heights; she could perform no complex tasks, but she could perform simple, routine tasks; she could perform low-stress tasks with no high production quotas or piece rate work, no work involving arbitration, negotiation, confrontation, or supervision, and could perform work with only superficial interpersonal interaction with the public, co-workers and supervisors; and while she could be in contact with many people during a workday, the time spent must be for a definite purpose and for a very short duration. Tr. at 599.

Based upon this RFC and the testimony of the VEs, the ALJ concluded that Plaintiff could perform her past relevant work as a cleaner, telemarketer, customer service representative, billing clerk, office clerk and dispatcher. Tr. at 607.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and she was not entitled to SSI. *Id.*

### III.    STEPS FOR ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

-3-

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ

may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.      RELEVANT MEDICAL HISTORY AND TESTIMONY**

      **A.      MEDICAL HISTORY**

On December 24, 2007, Plaintiff returned to the emergency room after she was punched in the nose and she received sutures.  Tr. at 412.  A CT of the head had been ordered previously, but Plaintiff had to leave to take care of her child and she had returned complaining of face pain and a headache. Tr. at 412.  She was diagnosed with facial trauma with a headache and possible wound infection.  *Id*.  She was given antibiotics.  *Id*.

On July 21, 2008, Plaintiff tested positive for cocaine and marijuana.  Tr. at 450.

On August 12, 2008, Plaintiff met face to face with Ms. Maggit, Community Support Specialist at Murtis H. Taylor Multi-Service Center ("Murtis"), as a readmittance and requested medication for her mental health symptoms and help in finding housing.  Tr. at 374.  It was noted that on August 11, 2008, Plaintiff spoke on the phone to Ms. Maggit about prior scheduled appointments that she had missed.  *Id*. at 375.

On September 5, 2008, Plaintiff met with a nurse at Murtis indicating that she was taking no medications and she felt like someone was following her.  Tr. at 506.  She stated that she had not slept for two days and was very hyper.  *Id*.  She was cooperative and made good eye contact.  *Id*. The nurse diagnosed bipolar II with psychotic features and restarted Plaintiff on Zyprexa as she indicated that it had helped in the past.  *Id*.

On October 30, 2008, Dr. Pickholtz conducted a psychological interview for the agency.  Tr. at 471.  Plaintiff informed Dr. Pickholtz that her bipolar disorder with psychotic features kept her from working.  *Id*.  She reported that she was living with her boyfriend, her five children and her sister-in-law.  *Id*.  She indicated that she was hospitalized at the age of 14 for depression and she received help from Murtis since 2006.  *Id*. at 472.  She explained that she received her medications through Murtis and was not participating in counseling.  *Id*.  She reported that she started using illicit drugs at the age of 15 and continued using until 2007.  *Id*.  She was using cocaine and marijuana three times per week during that time.  *Id*.  She indicated that before her current medications, she

-5-

was agitated, angry, depressed and easily agitated and she attempted suicide 6 or 7 times in the past, with three attempts in 2007.  *Id.* at 473.  She denied mood swings, significant vegetative depression, or homicidal or suicidal ideation on the current medications.  *Id.*

Plaintiff reported that she left school in the tenth grade because she did not get along with the other kids and she felt depressed and suicidal at that time.  Tr. at 472.  She stated that her grades in junior high and high school were in the A/B range and she earned her GED and attended one year of college and earned certification as a nursing assistant.  *Id.*  She indicated that she last worked in 2006 as a cleaner but left because she did not get along with others and she was depressed and sleepy.  *Id.*  She performed office work for four years prior to 2006 but left that job due to depression.  *Id.*

Dr. Pickholtz saw no signs of impulsivity or compulsions, and he noted that Plaintiff's motivation appeared average, and her speech and flow of thought was average with no flight of ideas or rambling.  Tr. at 473.  Plaintiff's eye contact was quite good, her range and mood were average and appropriate, and her pace and persistence during the evaluation fell in the low average range. *Id*. at 474.  He observed no anxiety symptoms as Plaintiff explained that before her current medications, she always felt paranoid, but not currently.  *Id.*  Plaintiff also indicated that before the current medications, she had visual hallucinations but she did not have those any longer although she had some auditory hallucinations twice per week, such as hearing footsteps.  *Id.*

Dr. Pickholtz found that Plaintiff was oriented and her long-term history was in the average range, but her recall abilities were low average.  Tr. at 474.  He noted her overall IQ to be about 90. *Id*.  He noted that the doctors at Murtis diagnosed Plaintiff with major depression, bipolar disorder Type II, a personality disorder, and polysubstance dependency.  *Id*. at 475.

Dr. Pickholtz diagnosed Plaintiff with bipolar affective disorder II with psychotic features. Tr. at 477.  He added that the intensity and severity of Plaintiff's affective complaints and mood seemed to be mild and Plaintiff reported infrequent auditory hallucinations, such as hearing footsteps.  *Id*. at 477.  He also noted that the severity of Plaintiff's difficulties "may have been caused by or exacerbated by her addictive processing."  *Id*.  Dr. Pickholtz also diagnosed mixed polysubstance dependence allegedly in remission as of two years ago, and mixed personality

-6-

disorder with some narcissistic and addictive personality features. *Id.* He rated her global assessment of functioning ("GAF") at 55, indicating moderate symptoms. *Id*. He opined that she was mildly impaired in understanding and following instructions, in maintaining attention and performing simple repetitive tasks, in relating to others, and in withstanding the stress and pressures of daily work activities. *Id.* at 476.

On November 12, 2008, Dr. Gerblich performed an evaluation of Plaintiff's physical complaints for the agency. Tr. at 479. He noted that Plaintiff's chief complaints were hypertension, asthma, anemia, GERD and bipolar disorder. *Id.* His physical examination of Plaintiff indicated that she had epigastric discomfort, but her musculoskeletal examination was normal, her upper and lower body muscle power was normal, and her range of motion was normal. *Id*. at 480. He diagnosed hypertension, asthma, anemia, GERD and bipolar disorder and opined that she had no significant limitations. *Id.*

On November 21, 2008, Dr. Terry, Ph.D., completed a psychiatric review technique form and rating of functional limitations as to Plaintiff's mental impairments. Tr. at 485-497. She found that from August 12, 2008 to the date of the reports, Plaintiff's affective disorder, personality disorder and substance addiction disorders caused only mild daily living activity restrictions, mild difficulties in social functioning, mild difficulties in maintaining concentration, persistence or pace, and she experienced no episodes of decompensation of extended duration. *Id.* at 485-495. Dr. Terry opined that Plaintiff had no severe psychological impairment as she had only mild limitations in all functional areas now that she was on medication and no longer using drugs. *Id*. at 497.

On November 25, 2008, Plaintiff met with a nurse at Murtis for follow up from her September 2008 appointment. Tr. at 505. She made good eye contact and had coherent speech, but she complained of trouble sleeping and the nurse found her judgment/insight and compliance with treatment to be "sketchy. Seems O.K. today." *Id*. The nurse increased Plaintiff's Zyprexa. *Id*.

On March 24, 2009, Dr. Castro, Psy.D, reviewed Plaintiff's file for the agency and affirmed the prior assessment after giving great weight to the consulting psychologists' opinions. Tr. at 508.

On March 31, 2009, Dr. Hinzman, M.D., reviewed Plaintiff's file for the agency and affirmed the prior decision finding that no severe medical impairment was noted as all of Plaintiff's

physical conditions, including GERD, hypertension and asthma, were controlled on medication. *Id.* at 509. On June 7, 2010, Dr. Enrique, one of Plaintiff's treating physicians, completed a Basic Medical Form on Plaintiff's behalf for Ohio Job and Family Services and noted Plaintiff's diagnoses of hypertension, peptic ulcer disease, chronic bronchitis, asthma, nicotine abuse, and history of marijuana and cocaine abuse. Tr. at 510. She noted that these conditions were improving with treatment. *Id.* She also indicated conditions of bipolar disorder and schizophrenia and noted that Plaintiff was treating at Murtis with psychiatrist Dr. Ramirez. *Id.*

Dr. Enrique opined that Plaintiff's conditions affected her abilities to stand and walk in that she could walk for three to four hours per eight-hour workday and could do so for one hour without interruption. Tr. at 511. She further opined that Plaintiff could sit for up to three to four hours per eight-hour workday and could sit for one hour without interruption. *Id.* Dr. Enrique concluded that Plaintiff could lift and carry up to ten pounds frequently and occasionally, and she was moderately limited in pushing and pulling objects, but was not limited in bending, reaching, handling, or in performing repetitive foot movements. *Id.* In supporting her limitations, she explained that Plaintiff easily became tired and felt weak or dizzy due to her medications, Plaintiff had complained of a sharp pain in the left side of her neck and arm over the past few weeks, and she sometimes had left lower extremity pain. *Id.*

On June 18, 2009, someone who did not sign the form completed a psychiatric evaluation at Murtis on behalf of Plaintiff, indicating that an update on the evaluation was necessary to accompany Plaintiff's application for entitlements. Tr. at 525. Plaintiff's past psychiatric history was noted, as well as her current medications. *Id.* at 525-526. The mental examination noted that Plaintiff was cooperative, with good eye contact, fair insight, and coherent speech, but she had decreased energy and attention and concentration. *Id.* at 527. She reported that she heard two voices and she thought that someone was behind her outside or was walking through her house. *Id.* Diagnoses included bipolar I disorder and rule out borderline personality disorder, and she was rated a GAF of 45 indicating serious symptoms. *Id.* at 528.

-8-

On September 2, 2010, Dr. Rakhit, a cardiologist, performed an abdominal aortogram, renal bilateral angiogram and iliac bilateral angiogram on Plaintiff. Tr. at 556. He diagnosed mild disease of the abdominal aorta, bilateral renals and aortic bifurcation. *Id*. at 557.

On September 27, 2010, a medical assessment of Plaintiff's ability to perform work-related actvities based upon her mental conditions was evidently completed by Kathleen Christy, Advanced Practice Nurse ("APN") at Murtis, even though the form had Dr. Ramirez's name typewritten as the physician/provider. Tr. at 565. Nurse Christy scratched out Dr. Ramirez's name and wrote in her own name. *Id*. She opined that that Plaintiff could follow work rules, relate to co-workers, deal with the public, use her judgment, interact with supervisors, and deal with ordinary work stress for 20% of an eight-hour workday, she could function independently 10% of the workday, and she could maintain attention and concentration 0% of the workday. Tr. at 565-566. The form requested the medical findings supporting this assessment and Nurse Christy wrote that Plaintiff had difficulty getting along with people in general. *Id*. at 566. Nurse Christy also checked boxes indicating that Plaintiff could understand, remember and carry out complex job instructions and detailed job instructions 10% of the workday, and understand, remember and carry out simple job instructions 20% of the workday. *Id*. This part of the form requested the medical findings supporting this assessment and Nurse Christy wrote that Plaintiff had poor concentration and a tenth grade education. *Id*.

In the third section of the form, Nurse Christy opined that Plaintiff could maintain her personal appearance 30% of the eight-hour workday, behave in an emotionally stable manner 20% of the workday, relate predictably 10% of the workday in social situations and demonstrate reliability 40% of the workday. Tr. at 567. Nurse Christy left blank the part of this section which requested that she include the medical findings supporting this assessment. *Id*. She further estimated that Plaintiff would be absent from work more than four times per month due to her impairments and the limitations that she opined lasted or would be expected to last for 12 continuous months or longer. *Id*. She indicated that Plaintiff's condition and restrictions had existed and persisted since March of 2006. *Id*. She further indicated that Plaintiff absolutely needed her medications but she was still symptomatic with them. *Id*. at 567.

-9-

On October 10, 2010, Dr. Ramirez, Plaintiff's psychiatrist at Murtis, completed a mental RFC form in which he opined that Plaintiff could follow work rules, interact with supervisors, deal with ordinary work stress, maintain attention and concentration, and function independently for 30% of an eight-hour workday, relate to coworkers 60% of the workday, deal with the public 40% of the workday, and use her judgment 50% of the workday.  Tr. at 521-522.  The form requested the medical findings supporting this assessment, but Dr. Ramirez left this section blank.  *Id*. at 522.  Dr. Ramirez also checked boxes indicating that Plaintiff could understand, remember and carry out complex job instructions 30% of an eight-hour workday, understand, remember and carry out detailed but not complex job instructions 50% of the workday, and understand, remember and carry out simple job instructions 50% of the workday.  *Id*.  This part of the form requested that Dr. Ramirez include the medical findings supporting this assessment, but he left this section blank.  *Id.*  Dr. Ramirez also checked boxes on the form indicating that Plaintiff could maintain her personal appearance and demonstrate reliability 40% of the eight-hour workday, behave in an emotionally stable manner 20% of the workday, and relate predictably in social situations 30% of the workday.  *Id.* at 522-523.  Dr. Ramirez also left blank the part of this section which requested that he include the medical findings supporting his assessment.  *Id.* at 523.

Dr. Ramirez further estimated that Plaintiff would be absent from work more than four times per month due to her impairments and the limitations that he opined lasted or would be expected to last for 12 continuous months or longer.  Tr. at 523.  He indicated that Plaintiff's condition and restrictions had existed and persisted since October of 2007.  *Id*.  He further indicated that Plaintiff may be sedated when asked what effect her medications had on her ability to function and he indicated her diagnosis as bipolar II disorder.  *Id*. at 523-524.

Murtis progress notes dated September 27, 2010 and October 11, 2010, indicated that Plaintiff presented for medication review with APN Christy, who found Plaintiff to be  cooperative with good eye contact, but complaining that her appetite was not good and she had trouble with hallucinations and attention and concentration.  Tr. at 530-531.  She related feelings of hurting someone and her medication was increased.  *Id*.

-10-

On October 26, 2010, Plaintiff presented to cardiologist Dr. Gupta-Rakhit, for a left heart catheterization, coronary angioplasty and a left angiogram. Tr. at 553. The results were normal. *Id*. at 554.

On October 26, 2010, Dr. Gupta-Rakhit completed a general medical statement for Plaintiff. Tr. at 569. He indicated that he had been treating Plaintiff for six months, he identified his diagnoses as hypertension and depression, and he listed her prognosis as good. *Id*. He noted that her conditions lasted or could be expected to last for at least 12 months and both were controlled by medications. *Id*. He identified Plaintiff's symptoms as multiple tender points, numbness and/or tingling, dizziness, excessive fatigue, stiffness, weakness, anxiety, depression, back pain, neck pain and chronic pain. *Id*. He checked "no" when asked if Plaintiff was a malingerer and he found no evidence that Plaintiff's emotional factors contributed to her symptoms and functional limitations. *Id*. He noted that Plaintiff's right and left cervical spine, her left shoulder and arm and her right and left legs were painful, and changing weather, stress, activity, repetitive motion and static positioning worsened her pain. *Id*. at 570. He opined that Plaintiff's pain would frequently interfere with her attention and concentration during a typical workday, and she could stand or walk thirty minutes at a time for a total of one hour or less during an eight-hour day, and she could sit up to one hour at a time up to two hours per workday. *Id.* at 571. He further opined that Plaintiff would need a sit/stand at will option, and she would have to take more than four unscheduled breaks of greater than 30 minutes at a time during an eight-hour workday in which to lie down, sit quietly and stretch and to elevate her legs at 30 degrees. *Id*. Dr. Gupta-Rakhiti further opined that Plaintiff could rarely lift and carry less than ten pounds and she could rarely twist, and never stoop, crouch/squat, bend or climb stairs. *Id*. at 572. He further opined that she could rarely to occasionally look down, and she could rarely turn her head right or left or look up. *Id*. Dr. Gupta-Rakhit further indicated that Plaintiff could rarely perform any overhead reaching, handling, or fingering of objects and she would be absent from work four days per month due to her impairments. *Id*. at 572-573.

On November 1, 2010, Dr. Enrique completed a general medical source statement indicating that she saw Plaintiff monthly for fifteen to thirty minutes each visit and she diagnosed hypertension, asthma, nicotine abuse, depression, GERD, and chronic pain in the neck, shoulder and left leg. Tr.

at 574.  Her prognosis for Plaintiff was stable with treatment and she identified Plaintiff's symptoms as dizziness, shortness of breath, weakness, depression, neck pain, and chronic pain and she identified that Plaintiff had left cervical spine, shoulder, arm, leg, and ankle pain, and she was not a malingerer.  *Id.* at 574-575.  She indicated that stress, cold, activity, repetitive motion and static positioning worsened Plaintiff's pain and the pain would frequently interfere with Plaintiff's ability to maintain attention and concentration to perform even simple work-related functions.  *Id.* at 575. Dr. Enrique opined that in an eight-hour workday, Plaintiff could stand or walk for thirty minutes at a time for a maximum of three hours per day, she could sit for one hour at a time for up to two hours per workday, and she needed an at-will sit/stand option and would need to take seven unscheduled breaks per workday of 15-30 minutes per break to lie down, sit quietly, and/or elevate her legs at a 30 degree angle.  *Id.* at 576.  She further opined that Plaintiff could frequently lift up to ten pounds, but could rarely lift twenty pounds and never lift fifty pounds.  *Id.* at 577.  She also indicated that Plaintiff could frequently twist, but she could occasionally stoop and bend, but she could rarely crouch/squat.  *Id.*  Dr. Enrique further opined that Plaintiff could rarely look down or turn her head left or right, she could occasionally look up and hold her head in a static position, she could rarely reach overhead with her left arm, frequently reach overhead with her right arm and could occasionally reach overhead with both arms.  *Id.*  She concluded that Plaintiff would be absent from work more than four days per month due to her impairments and her condition existed and persisted since October of 2007.  *Id.* at 578.

On December 10, 2010, Dr. Konieczny, Ph.D., conducted a psychological evaluation of Plaintiff for the agency.  Tr .at 580.  Plaintiff related her family history and indicated that she dropped out of high school in tenth grade because "I was trying to kill myself a lot as a teenager." *Id.* at 581.  She reported being hospitalized for psychiatric reasons on one occasion for six months when she was a teenager and she was treated for depression.  *Id.*  She received outpatient counseling as a teenager and was treating with Murtis for bipolar disorder.  *Id.*  She had some involvement in the juvenile justice system and had a history of marijuana and cocaine use, but had not used since 2006.  *Id.* at 581.  She reported taking Zyprexa, Zoloft, Depakote, Mycardis, Raitidine and Aspirin. *Id.*  She indicated that her longest period of employment was for one year as a customer service

representative and she had not worked since 2000, explaining that she did not get along with people and she had anger problems.  *Id.*

Upon examination, Dr. Konieczny noted that Plaintiff was pleasant and cooperative with adequate motivation.  Tr. at 581.  He indicated that she spoke well with no looseness of associations and her level of speech was greater than anticipated based upon intellectual testing.  *Id.* at 582.  She was oriented, had appropriate eye contact, no indications of nervousness or anxiety, no paranoid or grandiose thinking, no impairment in concentration and attention, moderate deficits in her awareness of rules of social judgment and judgment in general, and fair insight.  *Id.*  However, Dr. Konieczny noted that Plaintiff would require supervision and monitoring in the management of her daily activities and in handling her financial affairs as her overall level of functioning was at a reduced level of efficiency.  *Id.*

On the Wechsler Adult Intelligence Scale, IV, Plaintiff's full scale IQ was 60, which placed her in the extremely low range of adult intellectual functioning.  Tr. at 583.  On the Wide Range Achievement Test 4, Plaintiff's reading was in the low average range, although significantly higher than anticipated based upon her level of intellectual functioning.  *Id.*

Based upon his evaluation, Dr. Konieczny diagnosed Plaintiff with bipolar disorder, not otherwise specified and BIF.  Tr. at 584.  He opined that Plaintiff had no impairment in her ability to concentrate and to attend to tasks, mild impairment in understanding and following directions, and moderate impairments in withstanding stress and pressure and in dealing with the general public. He assigned her a GAF of 50, indicating serious symptoms.  *Id.* at 584.

On December 12, 2011, Plaintiff tested positive for cocaine and marijuana.  Tr. at 992.

On February 29, 2012, Dr. Damis at Murtis performed a psychiatric evaluation of Plaintiff. Tr. at 965.  Plaintiff presented complaining of excessive daytime sleeping, aggression, and isolation. *Id.*  She reported auditory hallucinations and suicidal ideations and she explained that she was taking no medications.  *Id.*  Dr. Davis found that Plaintiff was tearful and depressed, but had good eye contact and normal speech.  *Id.* at 966.  She diagnosed Plaintiff with severe bipolar disorder, Type I, with moderate suicidal ideations.  *Id.* at 967.  Dr. Davis prescribed medications.

-13-

On April 26, 2012, Plaintiff had a heart catheterization which showed lifestyle limiting claudication and peripheral artery disease.  Tr. at 927, 1052.

On November 16, 2012, Plaintiff underwent a left shoulder x-ray for her complaints of pain and numbness and it showed early osteoarthritis of the glenohumeral joint.  Tr. at 912.

A MRI of the same area on February 1, 2013 showed degenerative arthritic change at the glenohumeral joint with associated joint effusion and possible intra-articular loose body inferiorly, subchondral cystic change involving the glenoid and the posterolateral aspect of the superior humeral head, a possible mild tendinopathy at the distal insertion of the supraspinatus, and a suspect nondisplaced superior labral tear in association with a tiny anterior paralabral cyst.  Tr. at 915.  A neck MRI showed a small herniated disc central and to the right at the C5-C6 with rather mild encroachment on the right neural foramen but no cord compression.  *Id*. at 917.

A February 1, 2013 echocardiogram showed normal results except for mild mitral regurgitation and mild tricuspid regurgitation.  Tr. at 925.  On April 15, 2013, Dr. Keppler wrote Dr. Gupta-Rakhit a letter indicating that he saw Plaintiff and she complained of significant shoulder pain.  Tr. at 1057.  He noted that her rotator cuff was sound but her shoulder disturbed her sleep and her daily activities.  *Id*.  He indicated that upon examination, Plaintiff's motion was limited and there was bone on bone crepitus palpated.  *Id*.  He opined that she would do very well with total shoulder replacement.  *Id*.

On April 26, 2013, Dr. Diab, a rheumatologist, evaluated Plaintiff at the request of Dr. Gupta Rakhit for her complaints of stiffness and pain in her joints.  Tr. at 1028.  Upon examination, Dr. Diab indicated his impressions of moderate inflammatory polyarthritis.  *Id*.  He also suggested lupus and mixed connective tissue disease, although he had no objective findings supporting those conditions.  *Id*.  He also diagnosed fibromyalgia, indicating that it was a contributing factor to a lot of her symptoms, especially her generalized fatigue and interrupted sleep.  *Id*.  He prescribed Plaquenil and Meloxicam and ordered a blood test.  *Id*.  A follow-up visit indicated that Dr. Diab's impression was rheumatoid arthritis, fibromyalgia, and osteoarthritis with adhesive capsulitis in the left shoulder more than the right, status post left shoulder replacement.  *Id*. at 1029.

-14-

On May 28, 2013, Plaintiff underwent a left shoulder cup arthroplasty performed by Dr. Keppler for osteoarthritis of her left shoulder.  Tr. at 919-920.  Plaintiff thereafter underwent physical therapy and missed quite a few appointments.  Tr. at 930-931.  However, when she did attend therapy on July 5, 2013, she related that she followed up with Dr. Keppler who thought that she was progressing well and she rated her pain to be 3 on a 10-point scale.  *Id*. at 934.  Dr. Keppler's August 12, 2013 progress note indicates that Plaintiff had only shown up to physical therapy 30% of the time but he was still very happy with the results of the surgery.  *Id*. at 1007.

Notes from Murtis show counseling and medication management throughout Plaintiff's treatment.  Tr. at 910-911, 1040.  A January 17, 2013 treatment note indicates that Plaintiff was feeling agitated and annoyed with some paranoia as she felt like someone was walking behind her.  *Id*. at 910.  She reported that as long as she was not around people, she was fine, although she was up all night pacing and had no appetite.  *Id*.  She denied any auditory or visual hallucinations and her insight and judgment were fair.  *Id*.  Her diagnosis was severe bipolar disorder, Type I, with psychotic features.  *Id*.  Her Zyprexa was increased.  *Id*.  A July 26, 2013 progress note shows that Plaintiff met with Ms. Maggit at Murtis and told her that she planned to stay in counseling, remain on her medications and keep all of her doctor appointments.  *Id*.  Ms. Maggit noted that Plaintiff was talkative, did not pay much attention to her personal appearance and seemed to be restless and anxious, but was doing fairly well.  *Id*.  On September 4, 2013, Plaintiff was discharged from Murtis after missing appointments for counseling and it was noted that hospitalizations may have contributed to some of those absences.  *Id*. at 1042.

On July 29, 2013, Plaintiff underwent repair of an umbilical ventral hernia.  Tr. at 918.

On August 22, 2013, Plaintiff again attended therapy and explained that she had missed previous appointments because of medical conditions unrelated to her shoulder.  *Id.* at 1003.  On August 28, 2013, Plaintiff cancelled her physical therapy appointment because she reported that she was admitted to the hospital.  *Id*. at 1005.

On August 29, 2013, Plaintiff underwent a cardiac catheterization which showed abnormal ABIs and claudication, for which medical management was prescribed.  Tr. at 1045-1049.

On September 11, 2013, Dr. Keppler completed a medical source statement concerning Plaintiff. Tr. at 1010. He indicated that he saw Plaintiff monthly from April 9, 2013 through August 12, 2013. *Id.* He diagnosed Plaintiff with post-surgical cup arthroplasty and indicated that her prognosis was fair and her impairments did not last or were not expected to last at least twelve months . *Id.* He identified her symptoms as nonrestorative sleep, stiffness, weakness, swelling, and shoulder instability. *Id.* The location of the pain was in her left shoulder and arm and it was made worse by changing weather, fatigue, repetitive motion, and the cold. *Id.* at 1012. He opined that Plaintiff's pain and symptoms were severe enough to frequently interfere with her attention and concentration to perform even simple work tasks in a typical workday. *Id.* He further opined that Plaintiff could stand or walk up to three hours per workday, sit for up to six hours per workday, and she would have to take unscheduled breaks every hour for an average of 15 minutes per workday. *Id.* at 1014. He further indicated that Plaintiff could occasionally lift less than ten pounds with her left arm and never more than that, and she could occasionally kneel, stoop, crouch/squat, bend, climb stairs, balance, look down, turn her head to the right, look up, and turn her head to the left. *Id.* at 1016. He also opined that Plaintiff had significant reaching, handling and fingering limitations with her left side and she could never reach overhead with her left arm, but could frequently do so with her right and she could occasionally handle and finger with her left arm, hand and fingers, but could frequently do so with her right. *Id.* He also estimated that Plaintiff would be absent from work about two days per month due to her left shoulder impairment. *Id.* at 1018.

On September 13, 2013, Ms. Maggit completed an opinion regarding Plaintiff's functioning. Tr. at 1054. She indicated that she last saw Plaintiff on August 27, 2013 and she believed that Plaintiff could understand and remember very short and simple instructions 30% of an eight-hour workday, carry out short and simple instructions 40% of the workday, sustain an ordinary routine without supervision 10% of the workday, work in coordination with others without being unduly distracted by them 40% of the workday, and complete a normal workday or workweek without interruptions from psychologically based symptoms 5% of the workday. *Id.* She further opined that Plaintiff could perform at a consistent pace without an unreasonable number of rest periods 20% of the workday and accept instructions and respond appropriately to criticism from authority figures,

-16-

supervisors, police, etc. 10% of the workday.  *Id*.  The form requested the medical findings supporting this assessment, and Ms. Maggit stated that Plaintiff's tolerance was not good due to long episodes of pain and feeling stressed and helpless.  *Id*. at 1056.  She further noted that Plaintiff isolated and spent a lot of time home in bed.  *Id*.

As to medications, Ms. Maggit indicated that Plaintiff's medications help her to sleep, reduce her mood swings and control her violent tendencies, hypervigilance, suspicion and depressive feelings.  Tr. at 1056.  She stated Plaintiff's diagnosis as "bipolar disorder depressed severe w/psycho features."  *Id*.  She explained that Plaintiff could converse, but her attention wandered so much that it impaired her memory, following of instructions and accepting criticism and easily escalated her. *Id*.

On September 18, 2013, Dr. Ramirez completed another mental RFC form on behalf of Plaintiff.  Tr. at 1030.  He opined that Plaintiff could understand and remember very short and simple instructions 60% of an eight-hour workday, carry out short and simple instructions 60% of the workday, sustain an ordinary routine without supervision 40% of the workday, work in coordination with others without being unduly distracted by them 40% of the workday, and complete a normal workday or workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of rest periods and maintain concentration and attention for extended periods 40% of the workday.  Tr. at 1030-1031.  The form requested the medical findings supporting this assessment, but Dr. Ramirez left this section blank. *Id*. at 1031.  *Id*.  As to responding appropriately to supervisors, co-workers and usual work situations, Dr. Ramirez opined that Plaintiff could appropriately interact with the general public 60% of the eight-hour workday, accept simple instructions and respond appropriately to criticism from supervisors 40% of the workday, get along with co-workers 40% of the workday, and maintain socially appropriate behavior 60% of the workday.  *Id*. at 1031.  Dr. Ramirez also left blank the part of this section which requested that he include the medical findings supporting his assessment*. Id*. Dr. Ramirez further opined that Plaintiff could respond appropriately to changes in the work setting 60% of the workday and deal with ordinary work stress 40% of the workday.  *Id*. at 1031-1032.

-17-

Again, Dr. Ramirez left blank the section requesting that he include medical findings supporting his assessment.  *Id.* at 1032.

Dr. Ramirez further estimated that Plaintiff would be absent from work more than four times per month due to her impairments and the limitations that he opined lasted or would be expected to last for 12 continuous months or longer.  Tr. at 1032.  He further indicated that Plaintiff's medications have a marked impact on her ability to function.  *Id.*  He noted his diagnosis of bipolar disorder.  *Id.* at 1033.

On November 15, 2013, Dr. Gupta Rakhit completed another physical RFC assessment on behalf of Plaintiff.  Tr. at 1058.  He indicated his diagnoses of hypertension, left shoulder status-post replacement, fibromyalgia, chronic obstructive pulmonary disease, rheumatoid arthritis and chronic pain.  *Id.* He opined that her prognosis was fair and identified her symptoms as multiple tender points, nonrestorative sleep, excessive fatigue, stiffness, weakness, neck pain, chronic pain, numbness and/or tingling, dizziness, radicular pain, shortness of breath, anxiety, depression, and back pain.  *Id.*  He indicated that Plaintiff was not a malingerer and he noted that Plaintiff's bipolar disorder contributed to the severity of Plaintiff's symptoms and functional limitations.  *Id.*  He identified Plaintiff's pain at her lumbosacral, cervical, and thoracic spine on both sides, both shoulders, both arms, both hands, both legs and both ankles and feet.  *Id.* at 1059.  Dr. Gupta Rakhit indicated that changing weather, stress, the cold, fatigue, activity and repetitive motion worsened Plaintiff's pain and her pain and symptoms would frequently interfere with her attention and concentration to perform even simple work tasks in a typical workday.  *Id.*  He identified the side effects of her medication as making her sleepy and drowsy.  *Id.*

Dr. Gupta-Rakhit further opined that Plaintiff could stand and walk one hour at a time during an eight-hour workday for a total of one hour or less per workday.  Tr. at 1060.  He further opined that Plaintiff could sit for one hour at a time during a workday for a total of one hour or less per workday.  *Id.*  He further indicated that Plaintiff would need an at-will sit/stand/walk option, would need to use her walker, and would have to take unscheduled breaks of less than one hour per workday for one to two hours.  *Id.*  He also indicated that Plaintiff would have to elevate her legs at a 30 degree angle.  *Id.*  He opined that she could occasionally lift and carry less than ten pounds

-18-

and could never lift and carry any greater weight and she could occasionally kneel, stoop, crouch/squat, and bend, but could never climb stairs or balance. *Id*. at 1061. He indicated that Plaintiff could only occasionally look down, turn her head left and right, and look up. *Id*. He also limited Plaintiff to occasionally reaching overhead, handling objects and fingering objects, and he opined that her impairments would cause her to be absent more than four days per month. *Id*. at 1061-1062.

### B.    TESTIMONIAL EVIDENCE

At the November 18, 2013 hearing before the ALJ, Plaintiff appeared with a walker and testified that she was forty-two years old and had not worked since 2008 when she was self-employed. Tr. at 660-662. When asked by the ALJ what was wrong with her, Plaintiff responded that she has fibromyalgia, rheumatoid arthritis, she just had her shoulder replaced, she has bipolar disorder, high blood pressure, COPD, Raynaud's syndrome, GERD, fibroids, and she was recently having blackouts. *Id*. at 663. She explained that she started using the walker two months prior when her rheumatologist gave her a referral to her primary care physician for the walker. *Id*. at 664. Plaintiff indicated that she was still smoking one pack of cigarettes per day despite her COPD, but she had been smoking more. *Id.* at 665. She testified that she was using drugs and had stopped, but she relapsed in 2009, 2011 and earlier in 2013. *Id*. She stated that when she was not on her psychiatric medications, she will hang around the wrong people. *Id*. at 666. However, she testified that she was compliant with all of her medications and treatments and when asked whether the medications worked, she replied, "Most of the time I'm mostly asleep. To be totally honest with you, I'm rarely woke. Most of my meds keep me basically sedated, especially the psych ones." *Id.* When asked about her daily life, Plaintiff responded that she was typically in bed all day but for two or three hours and the pain keeps her from doing everyday chores. *Id*.

The PE then testified, reviewing Plaintiff's diagnoses of bipolar 1 disorder, BIF, major depressive disorder, polysubstance abuse in remission, and mixed personality disorder. Tr. at 676. He opined that none of those impairments, individually or in combination, met or equaled the Listings and with those impairments, Plaintiff could perform simple and routine tasks with simple instructions, minimal quotas, no confrontation, negotiation, arbitration and with minimal distraction.

*Id.* at 677. When Plaintiff's counsel asked about the medical evidence reviewed by the PE and if there were any conflicts in the evidence, the PE pointed out that the main conflict was the IQ score versus Plaintiff's actual ability, which the psychologists resolved by diagnosing BIF rather than mild mental retardation. *Id*. at 679. He also explained that a conflict existed between Plaintiff's extreme limitation claims in her testimony versus the evidence that he reviewed. *Id*.  As an example, he noted allegations of extreme limitations in social functioning, but pointed to the facts that she was pleasant and cooperative during medical examinations, she has a boyfriend, had good relationships with her parents, siblings, and children, and she was married for quite awhile. *Id.* at 680-681.  He further noted examinations indicating that Plaintiff's social judgment was only moderately impaired and she reported getting along with others, especially when on her medications. *Id*.

When Plaintiff's counsel pointed out that Plaintiff presented to Murtis on 53 occasions over a three-year period in treatment and she was noted as anxious, panicked or stressed out, the PE indicated that he did not know that statistic and then the ALJ stopped the examination, indicating that he would reschedule a supplemental hearing to complete the PE's examination. Tr. at 685-686. The ALJ then proceeded to call upon the VE and question her.  The VE identified Plaintiff's past relevant work and the ALJ thereafter asked the VE to assume a female hypothetical person with the same age, education and background as Plaintiff, with the limitations of: lifting and carrying up to 10 pounds frequently and 20 pounds occasionally; standing/walking and sitting 6 out of 8 hours per day, 1 hour at a time; occasionally pushing/pulling and foot pedaling, using a ramp or stairs, but never using a ladder, rope or scaffold; constantly balancing; frequently stooping, kneeling and crouching, but never crawling; reaching overhead occasionally with the left and frequently with the right; avoidance of dangerous machinery and unprotected heights; performing no complex tasks, but only simple, routine tasks that are low stress, with no high production quotas, pace rate work, and no work involving arbitration, confrontation, negotiation, or supervision; work with only superficial interpersonal interactions with the public, co-workers and supervisors; and contact with people during the day, but time spent with each one should be for a definite purpose and for a very short duration. *Id*.  at 687-689. Asking the VE to review Plaintiff's past relevant work, the ALJ asked if the hypothetical person could perform any of those jobs. *Id.* at 689.  The VE responded that such

-20-

an individual could perform Plaintiff's past relevant work as a cleaner, and could perform a number of other jobs existing in significant numbers in the national economy, including the representative jobs of laundry worker, office helper, and cafeteria attendant.  *Id.*

The ALJ presented a second hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the first hypothetical individual, but adding that the second hypothetical person would also be off task 20% of the time and would miss three to four days of work per month.  Tr. at 689.  The VE responded that no jobs would be available for the second hypothetical individual.  *Id.* at 690.

Plaintiff's counsel thereafter questioned the VE, asking the VE to assume the hypothetical individual also had pain and other symptoms frequently, meaning that they interfere with her ability to concentrate and to pay attention for even simple tasks two-thirds of the time.  Tr. at 690-691.  The VE responded that no jobs would be available for such a person.  *Id.* at 691.

Plaintiff's counsel asked the VE to assume separately and distinctly that a hypothetical individual is required to take unscheduled breaks every hour for approximately 15 minutes and asked whether jobs would be available for such a person.  Tr. at 691.  The VE responded that no jobs would be available.  *Id.*  Plaintiff's counsel asked the VE if jobs would be available for a hypothetical individual who is only allowed to handle or finger objects with the left hand occasionally and with the right hand frequently and the VE responded that no jobs would be available to such hypothetical individuals.  *Id.*

Plaintiff's counsel asked the VE to assume another hypothetical individual who would be off task 40 percent of the time in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  Tr. at 692.  The VE responded that no jobs were available for such a person.  *Id.*  Plaintiff's counsel asked the VE to assume a person who was able to perform at a consistent pace without unreasonable interruptions at most 40% of the time and the VE testified that no jobs were available for such a person.  *Id.*  The VE responded the same when Plaintiff's counsel asked whether jobs would be available for a hypothetical individual who would only be able to respond appropriately to supervision approximately 40% of the time.  *Id.*

On February 13, 2014, the ALJ held a supplemental hearing, where Plaintiff, the PE, and the VE testified.  The ALJ noted that Plaintiff was using a rollator and had been using it since April of 2013.  Tr. at 621.  Plaintiff reiterated that she slept most of the day or was in pain for the day.  *Id*. She explained that she began needing help with her hygiene following her shoulder surgery in May of 2013 as her muscles did not heal properly.  *Id*. at 621-622.

The ALJ then questioned the PE.  Tr. at 624.  He noted the PE's prior diagnoses of bipolar disorder, BIF, personality disorder, drug abuse in remission and the PE added diagnoses of major depressive disorder, BIF, victim of physical abuse, and borderline personality disorder.  *Id.*  When the ALJ asked whether the PE considered Plaintiff's drug abuse to be material, the PE responded yes.  *Id.* at 625.  The PE then opined a RFC, indicating that Plaintiff could perform one or two-step directions with very simple directions explained clearly and someone available to explain if needed, with minimal stress as possible to reduce quotas or no quotas if possible, little stress, no negotiation, arbitration, confrontation and an environment as distraction free as possible and very simple, routine tasks.  *Id.* at 625-626.

Plaintiff's counsel questioned the PE, asking the PE about the bipolar diagnosis.  Tr. at 628. The PE explained that Plaintiff's bipolar diagnosis was bipolar type one, which was primarily depression with some kind of thought disorder.  *Id*.  The PE also agreed that Plaintiff's history showed that she has more impulsive blurting out and racing thoughts which were part of the bipolar one diagnosis.  *Id.*  The PE also acknowledged the variability of symptoms with every psychology disorder and the PE agreed that the Murtis treatment records showed that Plaintiff was frequently angry, irritated or overly upset, which could be consistent with bipolar disorder.  *Id.* at 630-631.

The ALJ then questioned the VE, asking him to review Plaintiff's past relevant work.  Tr. at 645- 646.  The ALJ presented a hypothetical individual of a female with Plaintiff's age, education and background, who can lift and carry 20 pounds occasionally and 10 pounds frequently, who can sit, stand/walk 6 hours of an 8 hour day, 1 hour at a time, who can occasionally push, pull and foot pedal, occasionally climb a ramp or stairs, but never climb a ladder, rope or scaffold.  *Id*. at 646. The ALJ also added that the hypothetical individual can constantly balance, frequently stoop, kneel and crouch, but never crawl, and she can reach overhead only occasionally with the left and

frequently with the right, she had to avoid high concentrations of cold, wetness, humidity, smoke, fumes, dust and pollutants, dangerous machinery or unprotected heights, and she can perform no complex tasks but can perform simple, routine tasks of one to two steps, low stress tasks with no high production quotas, no pace rate work and no work involving arbitration, confrontation, negotiation or supervision. *Id*. at 646-647. The ALJ also added that the hypothetical individual can have only superficial interpersonal interactions with the public, co-workers and supervisors and she can be around people during the day, but the time spent with each one should be of a short duration and for a specified prupose. *Id.* at 647.

The VE responded that such a hypothetical individual could not perform any of Plaintiff's past relevant jobs. Tr. at 648. He testified that such a person could perform other jobs existing in significant numbers in the national economy, including the representative occupations of wire worker, electronics worker, and table worker. *Id*.

The ALJ asked the VE to consider a second hypothetical individual with the same limitations as the first hypothetical individual, but with the additional limitation of being off task 20% of the time and missing three to four days of work per month. Tr. at 648. The VE testified that no jobs would be available for such an individual. *Id*. at 649.

Plaintiff's counsel then asked the VE questions about the particular jobs that he identified. Tr. at 650-654. The VE responded that no jobs would be available for a person who yelled and screamed at her boss when the boss criticized her, or a person who could not arrive to work on time or who could not stay at the job for the required time period, or a person who had difficulty handling and fingering with the right hand and who could only occasionally use her left hand. *Id*. at 653. The VE also responded that no jobs would be available for a hypothetical individual who could only complete a normal workday and workweek without psychologically based symptoms 40% of the time or for a hypothetical person whose only limitation was being off task more than 10% or who missed three or four days of work per month. *Id*. at 653-654.

## VI. LAW AND ANALYSIS

### A. TREATING SOURCE OPINIONS

Plaintiff first alleges that the ALJ committed error when he failed to properly evaluate the medical opinions of Drs. Ramirez, Gupta-Rakhit and Enrique under Social Security Ruling ("SSR") 96-2p and the treating physician rule. ECF Dkt. #12 at 16.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*

-24-

If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

### 1.    Dr. Ramirez

Here, Plaintiff asserts that the ALJ failed to comply with SSR 96-2p when evaluating Dr. Ramirez's opinions because he failed to first address the controlling weight test and then failed to analyze the factors for determining the weight to give those opinions once he decided not to give controlling weight.  ECF Dkt. #12 at 14.  Plaintiff also complains that the ALJ failed to specify the evidence that conflicted with Dr. Ramirez's opinions and only stated that the opinions were on forms that were not accompanied by narratives even though the Murtis records were included in the file and supported Dr. Ramirez's opinions.  *Id*.  ECF Dkt. #12 at 14.  Plaintiff further contends that the ALJ did not even state the weight that he actually gave to Dr. Ramirez's opinions. *Id*.

Dr. Ramirez completed mental RFC forms on October 10, 2010 and on September 18, 2013.  Tr. at 521-523, 1030.  The ALJ acknowledged these statements and stated that he was not giving them great weight.  *Id*. at 604.  In support of his decision, the ALJ first asserted that Dr. Ramirez's

-25-

form was the same form completed by Ms. Ward, Nurse Christy and Ms. Maggit. *Id*. The undersigned recommends that the Court find that this is an inadequate reason for failing to give controlling weight to Dr. Ramirez's statements. While the forms may have been the same, no legal basis exists for discounting a treating physician's statement due to the fact that the statement was made on the same form as those completed by nurses and a social worker.

However, the ALJ also explained that he was not giving great weight to Dr. Ramirez's opinions because Dr. Ramirez did not provide an explanation for the very limited percentages of time that he opined that Plaintiff would be able to perform work-related activities even though the forms specifically requested that he do so. Tr. at 604. Plaintiff complains that this reason is insufficient for rejecting Dr. Ramirez's opinions because the Murtis treatment notes supported those opinions and the ALJ failed to discuss the evidence that conflicted with Dr. Ramirez's opinions. ECF Dkt. #12 at 14. Plaintiff also asserts that the ALJ's rejection of Dr. Ramirez's opinions violated *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013) and SSR 96-2p as he failed to first analyze the opinions for controlling weight status before weighing the six factors for determining the weight that he would attribute to Dr. Ramirez's opinions. ECF Dkt. #12 at 14.

In *Gayheart*, the Sixth Circuit Court of Appeals emphasized that the social security regulations require that two separate analyses occur when evaluating a treating source's opinion. 710 F.3d at 375-377. The ALJ must first consider whether to give the treating source's opinion controlling weight by determining if it is well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Id*. Then, when the ALJ decides not to give controlling weight to the opinion, the ALJ moves on to determine the weight that the opinion should receive based on the regulatory factors. *Id*.

Courts in this District have reasoned that *Gayheart* did not present a new interpretation of the treating source doctrine, but rather reinforced the prior holdings of the Sixth Circuit. *Aiello–Zak v. Comm'r of Soc. Sec.*, No. 5:13–CV–987, 2014 WL 4660397, at *4 (N.D.Ohio Sept.17, 2014) (citing *Rogers v. Comm'r*, 486 F.3d 234 (6th Cir.2007); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.2009); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009)). The Sixth Circuit has also held that if "the ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons

-26-

for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template." *Id.* at *5 (citing *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 427–28 (6th Cir.2014) ).  However, "the reasons must be supported by the evidence in the record and sufficiently specific to make clear the weight given to the opinion and the reasons for that weight." *Brasseur v. Comm'r of Soc. Sec.*, 525 F. App'x 349, 351 (6th Cir.2013) (citing *Gayheart*, 710 F.3d at 376).

Courts in this District have upheld ALJ determinations that did not comply with *Gayheart.* As pointed out by Defendant, the Court in *Phillips v. Commissioner of Social Security,* 972 F.Supp.2d 1001 (N.D. Ohio 2013) faced an analysis similar to the ALJ in this case and nevertheless found that the treating physician rule was adequately met.  The treating source in *Phillips* completed a check box medical source statement concerning Phillips' limitations resulting from peripheral arterial disease.  972 F.Supp.2d at 1005.  The doctor had checked the relevant symptoms on the form that Phillips was experiencing and he opined standing, walking, sitting, lifting and leg elevation limitations for an eight-hour workday.  *Id.*  The ALJ stated that he attributed little weight to the statement because it was "conclusory and is not supported by the record."  *Id.* at 1006.  Phillips asserted that the ALJ's analysis did not meet the regulations or the Court's standard in *Gayheart. Id.*

Despite the fact that the ALJ did not analyze the determination of controlling weight separately, the *Phillips* Court explained that the ALJ's finding that the opinion was conclusory and unsupported by the record,

> coupled with the ALJ's conclusion that "[t]here are no [office or treatment] records" (*id.*) to support certain claimed physical conditions, this is the functional equivalent of a determination by the ALJ that the treating physician's opinion (expressed in mere check marks on a form) need not be given controlling weight under the regulation because it was *not* "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and *was* "inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2). In other words, the opinion of Dr. Dhyanchand was so "patently deficient" that it could not be credited. *Cole,* 661 F.3d at 940; *see also Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) (even though "medical opinions and diagnoses of treating physicians are entitled to great weight [,]" "the ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation' " (quoting *King v. Heckler,* 742 F.2d 968, 973 (6th Cir.1984)). Further, although the ALJ's articulation of his reasons was very brief, it was clear and made specific reference to exhibits in the record by way of support. Finally, although plaintiff argues that the

ALJ failed to make a controlling weight determination before he applied the factors of specialization of the source and length of the treatment relationship, this is not so, as revealed by a simple review of the ALJ's opinion: the declaration that Dr. Dhyanchand's opinion would be given little weight was made prior to the additional conclusions that he was not a specialist and had a short treatment relationship with plaintiff.

*Phillips*, 972 F.Supp.2d at 1007-1008.

In *DeGarmo v. Commissioner of Social Security*, No. 12CV2740, 2014 WL 903109 (N.D. Ohio Mar. 7, 2014), the Court cited to *Phillips* in finding that the ALJ's violation of the treating physician rule was harmless error as the treating physician's opinions were patently deficient. The ALJ in *DeGarmo* attributed no weight to the opinions of Dr. Ramirez, DeGarmo's psychiatrist at Murtis, who had completed a work ability form in a "cursory" manner and concluded that DeGarmo was unemployable and could not sustain employment eight hours a day, five days a week because she reacted with anger to stress and could only concentrate for short periods of time. *Id.* at *7-*8. The *DeGarmo* Court noted that Dr. Ramirez's opinion was mostly dependent upon the evaluations by other sources, including nurses and APNs, and the opinion did not refer to Dr. Ramirez's treatment notes for support, making evaluation of the treatment notes that Dr. Ramirez relied upon speculative for an adjudicator. *Id.* at *8. The Court concluded that:

> similar to the reasoning employed by Judge Lioi in *Phillips*, any error in how the ALJ complied with the articulation of "good reasons" requirement associated with denying controlling weight to the opinion of a treating source is harmless because the opinion here was so patently deficient that the Commissioner could not possibly credit it. The ALJ's stated finding that Dr. Ramirez's opinion was entitled to no weight is well-supported by facts, cited above, which show that the brief conclusions on limitations are not supported by any medically acceptable clinical and laboratory diagnostic techniques, nor are they consistent with the other substantial evidence in the record. Further, the fact that the ALJ conducted much of his analysis of the limitations evidence immediately prior to assigning weight to the various opinions in this matter should not obscure the fact that a detailed analysis, capable of meaningful judicial review, was conducted by the ALJ here, and that it is sufficient to show that any error in applying the good reasons requirement of the treating physician rule to Dr. Ramirez was harmless.

*Id.* at *9.

Similarly in this case, the ALJ reviewed the treatment and examining records concerning Plaintiff's mental health conditions and he indicated that he did not give great weight to the opinions of Dr. Ramirez. Tr. at 604. He noted that while Dr. Ramirez circled percentages indicating the parts of the workday that Plaintiff would be able to perform certain work-related duties, he failed to

-28-

provide any explanation or narrative to support his extreme limitations, despite the form requesting that he do so. *Id*. The ALJ searched the record and also noted that the first notes from Dr. Ramirez indicating his treatment of Plaintiff were from 2010 and indicated that Plaintiff was doing "OK". *Id*. The ALJ also cited the treatment notes from Plaintiff's nurse, APN, and mental health specialist at Murtis which indicated that Plaintiff was discharged from the program in September of 2013 but did not explain why she was discharged and they also noted that she was inconsistent with her treatment, but was doing fairly well in July of 2013. The ALJ further noted that Plaintiff's mental health conditions were stable when she complied with her medications and when she abstained from substance abuse and did not run out of medications. Tr. at 600-604. Thus, the ALJ found that Dr. Ramirez's opinions lacked support because he failed to provide explanations for his extreme conclusions on the forms and the ALJ's review of treatment notes and other medical reports showed that Dr. Ramirez's opinions were inconsistent with the other evidence of record. Accordingly, while the ALJ did not technically comply with the treating physician rule by separating his controlling weight analysis, the undersigned recommends that the Court find that this is harmless error as the ALJ's analysis implied that he was not attributing controlling weight to Dr. Ramirez's opinions and the ALJ provided sufficient reasons for not attributing such weight to those opinions.

### 2.     Drs. Gupta-Rakhit and Enrique

Plaintiff also asserts that the ALJ failed to comply with *Gayheart*, the treating physician rule and SSR 96-2p in evaluating the opinions of Drs. Gupta-Rakhit and Enrique. ECF Dkt. #12 at 15-16.

The ALJ outlined Dr. Gupta-Rakhit's October 2010 and Dr. Enrique's June and November 2010 statements in his decision. Tr. at 604-605. He explained that he considered the opinions pursuant to SSR 96-2p as they were from Plaintiff's treating physicians. *Id*. However, the ALJ stated that he gave the opinions little weight because the objective medical evidence did not support them and he cited the results of Dr. Gerblich's November 2008 consulting evaluation of Plaintiff's impairments as support. *Id*. at 605. The ALJ also stated that no documentation existed in the record to support their opinions. *Id.*

The undersigned recommends that the Court find that the ALJ's analysis does not meet the requirements of the treating physician rule and *Gayheart*. The ALJ's reliance upon the assessment

by Dr. Gerblich to afford little weight to Dr. Gupta-Rakhit and Dr. Enrique's opinions is insufficient because Dr. Gerblich's opinion preceded their opinions by two years or more as it is dated November of 2008 and Dr. Enrique's opinions are dated June and November of 2010, and Dr. Gupta-Rakhit's opinions are dated October 2010 and November of 2013.

While the ALJ's analysis of both of Dr. Enrique's opinions and Dr. Gupta-Rakhit's October 2010 opinion do not meet the treating physician rule, the undersigned recommends that the Court find that the ALJ's error as to these opinions is harmless because the assessments are so patently deficient that he could not credit them.  There are instances where an ALJ's failure to comport with the treating source doctrine may be deemed harmless. A violation of the rule might constitute "harmless error" where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of §1527(d)(2) – the provision of the procedural safeguard of reasons – even though [ ]he has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

The undersigned first points out that Dr. Enrique's June 2010 completion of the Basic Medical Form listed rather severe functional limitations based upon the medical conditions of hypertension, asthma, chronic bronchitis and peptic ulcer disease.  *Id.* at 511-512.  No medical or objective findings accompanied the assessment and Dr. Enrique merely noted as support for her limitations that Plaintiff felt tired and weak and for the past few weeks had sharp pain at the left side of her neck and left lower extremity.  *Id.* at 511.  Further, Dr. Gupta-Rakhit's October 26, 2010 assessment also opined severe functional limitations, but based these limitations only upon his identified diagnoses of hypertension and depression that he stated were controlled on medications. Tr. at 569.  And Dr. Enrique's November 2010 assessment also contains similarly severe functional limitations with only the identified diagnoses of hypertension, asthma, GERD, nicotine abuse, depression, and chronic pain, and she opined that Plaintiff's prognosis is stable with treatment.  *Id.* at 574.  For these reasons, the undersigned recommends that the Court find that the ALJ committed harmless error in violating the treating physician rule as to both of Dr. Enrique's 2010 assessments and Dr. Gupta-Rakhit's 2010 assessment.

-30-

While the undersigned recommends that the Court find that harmless error occurred in the ALJ's treatment of Dr. Enrique's assessments and the 2010 assessment of Dr. Gupta-Rakhit, the same cannot be said of Dr. Gupta-Rakhit's November 2013 assessment. In fact, as pointed out by Plaintiff, the ALJ did not even address Dr. Gupta-Rakhit's November 15, 2013 assessment. Tr. at 1058. Moreover, unlike the forms completed by Dr. Ramirez, the form completed by Dr. Gupta-Rakhit included sections for him to identify the symptoms from which Plaintiff suffered and he completed those sections. *Id*. at 1058-1062. Further, Dr. Gupta-Rakhit's November 15, 2013 assessment included diagnoses more aligned with the severe functional limitations opined, as they included Plaintiff's left shoulder status post-replacement, fibromyalgia, rheumatoid arthritis and chronic pain. *Id*. at 1058. The records of Dr. Gupta-Rakhit also include letters from Dr. Keppler, the doctor who performed Plaintiff's left shoulder cup arthroplasty and notes from Dr. Diab, a rheumatologist to whom Dr. Gupta-Rakhit referred Plaintiff. *Id*. at 919-920, 930-931, 1010-1018, 1028, 1057.

Accordingly, the undersigned recommends that the Court find that it is unable to conduct a meaningful review of whether the ALJ properly applied the treating physician rule to the November 15, 2013 opinion of Dr. Gupta-Rakhit. The undersigned recommends that the Court remand the instant case for proper application, evaluation and articulation of the treating physician rule to the November 15, 2013 assessment of Dr. Gupta-Rakhit.

### B. PLAINTIFF'S OTHER CLAIMS OF ERROR

Plaintiff makes a host of other assertions of ALJ error. She contends that the ALJ erred in his treatment of the opinions of the PE, Dr. Gerblich and Dr. Pickholtz, APN Christy, Ms. Ward, Ms. Maggit, and the statements made by lay witnesses, and his credibility determination. ECF Dkt. #12 at 12-24.

#### 1. Credibility

The undersigned recommends that the Court decline to address the assertions of error relating to Plaintiff's credibility as the ALJ's reevaluation of the evidence relating to Dr. Gupta-Rakhit's November 15, 2013 assessment may impact his findings under this step of the sequential analysis. See *Trent v. Astrue*, Case No. 1:09CV2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011)(Court

-31-

declined to address claimant's remaining assertion of error because remand already required and the ALJ's application of the treating physician rule on remand might impact his findings under the sequential disability evaluation).

### 2.      Opinions of PE, Dr. Pickholtz and Dr. Gerblich

Plaintiff also raises assertions of error concerning the ALJ's treatment of the opinions of the PE Steiner, Dr. Gerblich and Dr. Pickholtz.  ECF Dkt. #12 at 16-17.  She contends that the ALJ improperly attributed great weight to the opinions of these doctors.  As to the PE, Plaintiff asserts that the ALJ erred in attributing great weight to his opinion because it was contrary to that of her treating physicians, he never examined Plaintiff, and he appeared to issue his opinion without reviewing the psychological limitations that her medical providers opined.  *Id.*

The undersigned recommends that the Court find no merit to Plaintiff's assertion.  Dr. Steiner testified at both the November 18, 2013 and February 13, 2014 hearings.  Tr. at 616, 657.  He identified Plaintiff's psychological impairments as bipolar I disorder, BIF, major depressive disorder, polysubstance dependence in remission, victim of physical abuse and mixed personality disorder.  *Id.* at 624, 676.  While it appears that he did not have all of the relevant exhibits to review at the first hearing, he did for the second hearing.  *Id.* at 641-642.  Dr. Steiner testified that he did review all of the exhibits in the file, including the reports of Dr. Ramirez.  *Id.* at 640.  Plaintiff's attorney questioned Dr. Steiner about his contrary opinions to those of Dr. Ramirez, APN Christy and Ms. Ward and Dr. Steiner addressed the challenges presented by Plaintiff's attorney.  *Id.* at 642-646.

Opinions from agency medical sources are considered opinion evidence.  20 C.F.R. § 416.927(f). The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii). More weight is generally attributed to examining medical source opinions than on non-examining medical source opinions.  *See* 20 C.F.R. § 416.927(d)(1). However, an ALJ can attribute significant weight to the opinions of a non-examining state agency medical expert in some circumstances because

nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. However, the Sixth Circuit has held that the social security regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one examining physician's opinion over another. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir.2006).

Here, the ALJ decided to attribute less than controlling weight to the opinions of Dr. Ramirez because he found those opinions unsupported by Dr. Ramirez and by the record as well. Once he made this treating physician determination, the ALJ was free to review the opinions and the other medical sources in the record, including agency examining psychologists Drs. Pickholtz and Konieczny, and PE Steiner, and determine the weight to assign to each. He attributed great weight to the opinions of Dr. Pickholtz, who examined Plaintiff in 2008 and found mild limitations in Plaintiff's mental abilities to perform work-related tasks that were simple repetitive tasks. Tr. at 601. He also reviewed Dr. Konieczny's mental examination of Plaintiff for the agency in December of 2010, who found that Plaintiff had mild limitation in understanding, remembering, and executing simple instructions, no more than moderate limitation in making judgments for simple work-related decisions, interacting with the public, supervisors and co-workers, and in responding to usual work situations and changes in the work setting. *Id.* at 602. The ALJ also gave great weight to the opinions of PE Steiner, finding that Dr. Steiner's testimony was based upon review of all of the medical records and Dr. Steiner adequately explained his findings to Plaintiff's counsel upon questioning. *Id.* at 600-601. Dr. Steiner testified that he had considered the assessments by Dr. Ramirez, APN Christy and Ms. Ward and other medical sources, as well as Plaintiff's credibility in crafting his mental RFC for Plaintiff. *Id.* The ALJ's review of these opinions was appropriate and properly supported and explained.

For these reasons, the undersigned recommends that the Court find that the ALJ properly considered the nontreating medical source opinions of Drs. Pickholtz and PE Steiner and provided adequate reasoning for attributing great weight to those opinions.

-33-

As to Plaintiff's assertion concerning the ALJ's treatment of the opinions of Dr. Gerblich, the undersigned has already addressed the ALJ's reliance upon this 2008 opinion and recommended that the Court agree that it was harmless error for the ALJ to rely upon this assessment as support for rejecting the 2010 opinions of Dr. Enrique and the 2010 opinion of Dr. Gupta-Rakhit since Dr. Gerblich's assessment preceded their assessments by nearly 2 years or more. However, the undersigned further recommended that the Court find that the ALJ did commit error that was not harmless in rejecting Dr. Gupta-Rakhit's November 2013 assessment.

### 3. Other source opinions

Plaintiff also challenges the ALJ's treatment of the opinions of APN Christy, Ms. Ward and Plaintiff's family and friends. ECF Dkt. #12 at 18-19. The undersigned recommends that the Court find no merit to Plaintiff's assertions.

The ALJ reviewed the assessments of APN Christy, Ms. Ward, and Ms. Maggit, and the third-party statements of Plaintiff's family and friends. Tr. at 603-604, 606. As to APN Christy, Ms. Ward and Ms. Maggit, the ALJ specifically indicated that he reviewed their checkbox assessments because those individuals provided Plaintiff with mental health services. *Id*. at 603-604. He noted that neither were acceptable medical sources under SSR 06-3p and 20 C.F.R. §416.902, but he considered their opinions concerning the severity of Plaintiff's impairments and the limitations resulting therefrom. *Id.* at 604.

The ALJ is correct that ANP Christy as a nurse practitioner and Ms. Ward and Ms. Maggit as a licensed social worker and mental health specialist are considered "other sources" and not "acceptable medical sources" under the Social Security Regulations. *See* 20 C.F.R. §§ 404.1513(a),(d). Although information from "other sources" cannot establish the existence of a medically determinable impairment, their information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Social Security Ruling ("SSR") 06-03p . SSR 06-03p discusses opinion evidence from "acceptable medical sources" and from "other sources" and highlights the importance of some "other sources," such as nurse practitioners and licensed social workers:

These regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 CFR 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p.

In evaluating the opinions of "other sources" who have seen the claimant in a professional capacity, the ALJ should consider how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment.  SSR 06-03p; *see also Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541 (6th Cir.2007).  SSR 06–03p further provides that ALJs "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p.

The undersigned recommends that the Court find that the ALJ in this case did comply with the relevant social security rulings and regulations in addressing the assessments of APN Christy, Ms. Ward and Ms. Maggit.  The ALJ attributed little weight to the assessments and explained that the forms that they completed were mere checkbox forms and they gave only limited explanations for the limitations that they opined.  Tr. at 603-604.  He further indicated that neither of the assessments considered Plaintiff's substance abuse and its effects and whether the substance abuse exacerbated her mental health conditions.  *Id*. at 604.  The ALJ further explained that the assessments failed to consider the records which showed that at times, Plaintiff would mix her medications with alcohol and drugs.  *Id*. at 604.  These reasons, coupled with the ALJ's review of the records relating to Plaintiff's mental health history and other acceptable medical sources in the

file, constitute substantial evidence to support the ALJ's treatment of the assessments of APN Christy, Ms. Ward, and Ms. Maggit.

As to the third-party statements made by Plaintiff's family and friends, Section 404.1513 (d) of Title 20 of the Code of Federal Regulations provides that other sources may provide evidence to show the severity of a claimant's impairment and how it impacts a claimant's ability to work. 20 C.F.R. § 404.1513(d). "Other sources" include non-medical sources such as spouses, parents, other care-givers, siblings, relatives, friends, neighbors and clergy. *Id*. SSR 06–3p provides that an ALJ should consider evidence from non-medical sources who have not seen a claimant in a professional capacity and the ALJ may consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that support or refute the evidence." SSR 06–3p.  However, the Sixth Circuit has held that "an ALJ can consider every piece of evidence without addressing [all the evidence] in his opinion." *Kornecky v. Comm'r of Soc. Sec*, 167 Fed. App'x 496, 507–508 (6th Cir. 2006).

The ALJ explicitly stated in his decision that he carefully considered the statements of Plaintiff's friends and relatives and he cited to them in his decision.  Tr. at 606.  However, he rejected these statements solely because they were made by people who were biased in Plaintiff's favor. *Id.*  The undersigned recommends that the Court find that the ALJ's reason for rejection is insufficient as the social security regulations and rulings specifically allow for the consideration of such statements to show the severity of a claimant's impairments and the impact of the severity of those impairments upon a claimant's ability to work.  *See Teel v. Comm'r of Soc. Sec.*, No. 1:10CV613, 2011 WL 6256952, at *20, n. 5. (S.D.Ohio Aug. 22, 2011).  The ALJ's outright rejection of such statements because of undue bias would render the social security rulings and regulations allowing such statements superfluous.  20 C.F.R. § 416.913; SSR 06-03p.  Moreover, because the evaluation of the third-party statements necessarily relates to consideration of Plaintiff's credibility, of which the undersigned has recommended remand in conjunction with the violation of the treating physician rule, the undersigned further recommends remand of the third-party statements for the ALJ to reevaluate.

For these reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's rejection of the opinions of APN Christy, Ms. Ward and Ms. Maggit, but not the third-party statements of Plaintiff's family and friends.

**VI.**     **CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case to the ALJ to properly apply and articulate the treating physician rule with regard to the November 15, 2013 opinion of Dr. Gupta-Rakhit and to reevaluate and reconsider Plaintiff's credibility and the third-party statements of Plaintiff's family and friends.


DATE: November 25, 2015            ___*/s/George J. Limbert*_____
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE


        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).